United States Bankruptcy Court

Eastern District of Michigan – Northern Division

| | | | |
|---|---|---|---|
| In re | MAGDALENA PEREZ,<br>Debtor | )<br>) | Case No. 24-21078-dob |
| | KISHORE JAYAKUMAR,<br>Plaintiff | )  | Adversary Proceeding: |
| | v | ) | 26-02010-DOB |
| | MAGDALENA PEREZ.<br>Defendant/Third-Party Plaintiff | )<br>) | Chapter<br>7 |
| | V | ) | |
| | DAVID STOCKMAN, AND | ) | |
| | MICHIGAN HEALTH CLINIC | ) | |
| | Third-Party Defendants | ) | |


MATTHEW L. FREY (P68239)
Attorney for Debtor/Defendant
4901 Towne Centre Road, Suite 235
Saginaw, MI 48604
989-799-2227
mfrey@matthewfreylaw.com

WARNER NORCROSS + JUDD LLP
Jonathan Lauderbach (P51313)
Attorney for Creditor/Plaintiff
715 East Main Street suite 110
Midland MI 48640
989-698-3700
jlauderbach@wnj.com


**DEFENDANT/THIRD PARTY PLAINTIFF'S RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION, INTERROGATORIES, AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

NOW COMES, Magdalena Perez, Debtor/Defendant/Third-Party Plaintiff, and for her responses to the above-captioned matter states as follows:

**REQUESTS FOR ADMISSION**

1. Admit that at the time you recruited and hired Dr. Jayakumar in August-September 2023, you knew that MHC was not paying its current liabilities on time, including without limitation those liabilities with respect to employees and vendors.

RESPONSE: Admit that I was aware some payments to employees and vendors were delayed. I was concerned and stressed by recurring payment difficulties, but Dr. David Stockman repeatedly assured me that money was coming in and that the outstanding payments would be handled. In my experience, many delayed payments were eventually made. I did not control the company's funding or have complete information about its finances. I cannot confirm the status of every liability at the time of Dr. Jayakumar's recruitment.

2. Admit that you did not disclose MHC's financial difficulties to Dr. Jayakumar at any time before or during his employment.

RESPONSE: Admit that I did not specifically disclose MHC's financial difficulties to Dr. Jayakumar before or during his employment. My role was HR and administrative coordination; Dr. Stockman controlled financial decisions and repeatedly reassured me that payment issues would be resolved.

3. Admit that you maintained employment records for employees at MHC, including physicians.

RESPONSE: Admit. Maintaining employment and personnel records, including records for physicians, was part of my HR responsibilities.

4. Admit that you administered payroll for MHC employees.

RESPONSE: Admit. I handled the administrative processing of payroll for MHC employees. Dr. Stockman reviewed and directed payroll-related decisions, including payment methods and check distribution.

5. Admit that you had authority to hire and fire employees at MHC, including physicians.

RESPONSE: Deny that I independently had final authority to hire or terminate employees, including physicians. I coordinated HR processes and communicated decisions, but I did not make those decisions on my own; physician hiring and termination decisions rested with Dr. Stockman.

6. Admit that you participated in hiring and termination decisions relating to employees at MHC, including physicians.

RESPONSE: Admit that I participated in discussions and coordinated HR paperwork or communications regarding hiring and terminations. Final decisions were made by the responsible department leaders and, for physicians, Dr. David Stockman.

7. Admit that you participated in determining or negotiating compensation terms for MHC employees.

RESPONSE: Admit that I communicated proposed compensation terms between candidates or employees and department leadership or Dr. Stockman. Deny that

I independently determined or approved compensation amounts.

8. Admit that you were a member of MHC's senior leadership.

RESPONSE: Admit that I held an administrative leadership title, Chief Administrative Officer/HR Director, and coordinated HR and office operations. However, Dr. Stockman made the final decisions regarding company funding and physician compensation.

9. Admit that MHC owes Dr. Jayakumar no less than $132,109.50 in unpaid wages.

RESPONSE: I cannot admit the stated amount. I was involved with processing Dr. Jayakumar's initial payment, but he continued working for MHC after I left. I do not have the payroll, RVU, or other records necessary to determine the total amount, if any, owed to him.

**INTERROGATORIES**

1. Describe, with specificity, all of your job titles, duties, and responsibilities at MHC from January 2023 until the end of your employment with MHC.

   RESPONSE: During the relevant period, my title at MHC was Chief Administrative Officer/HR Director. My work primarily involved human resources, recruiting and onboarding, employee records, benefits, payroll processing, employee relations, and helping coordinate day-to-day administrative matters. I prepared payroll and communicated with employees, department managers, physicians, and Dr. Stockman about staffing, payroll, and other office issues. Although I used the title Chief Administrative Officer, I did not independently control company funds, decide physician compensation, or decide when payments or checks would be released. I brought issues to Dr. Stockman, who made the financial decisions and directed how payments were handled.

2. Identify all bank accounts for which you were a signatory, had withdrawal authority, or had authority to make ACH, wire, or other transfers during the Relevant Period, including accounts held by MHC, GLBS, or any other Stockman-related entity.

   RESPONSE: The only bank account on which I recall being listed was the GLBS account at Wildfire Credit Union. I did not have independent control over Dr. Stockman's personal or other business accounts. I processed payroll and, for a limited period, deposited checks or relayed payment information as directed by Dr. Stockman. I did not independently decide whether to fund payroll, issue wires, or distribute checks. I asked to be removed from the Wildfire account and from GLBS, and later verified online that my name was no longer listed with the company. I cannot confirm all account-signatory or transaction permissions without the bank records.

3. Describe, with specificity, your role and responsibilities at GLBS during the Relevant Period, including without limitation your ownership interest and all duties you performed on behalf of GLBS.

   RESPONSE: I was listed on the Michigan state business website as having an approximately 5% ownership interest in GLBS. I did not sign an ownership agreement, receive ownership documents, or receive profit distributions or other compensation for that designation. My actual activities were limited to administrative payroll processing and depositing checks at Dr. Stockman's direction for a short period. I do not recall the precise number of payroll cycles. I repeatedly asked Dr. Stockman to remove my name from GLBS and the Wildfire account; the company listing was not changed promptly, but I later checked the state website and verified that my name was no longer listed. I did not maintain GLBS financial records.

4. Identify all complaints you received, whether orally or in writing, from employees, vendors, or other persons regarding MHC's failure to timely pay or bounced checks or transfers during the Relevant Period. For each complaint, state the date, the identity of the complaining party, the substance of the complaint, and the complaint's resolution.

   RESPONSE: I recall that employees or others sometimes raised concerns about delayed payments, but I do not have the records needed to identify every complaint, date, amount, complainant, or resolution. My usual role was to relay concerns to Dr. Stockman, who controlled funding and payment decisions. I no longer have access to MHC's records. I can supplement this response if additional specific information becomes available.

5. Describe in detail how the amount of $10,500 for Dr. Jayakumar's first paycheck was calculated, including each person involved in determining the amount, the source of any RVU data used in determining the amount, and any direction Stockman gave regarding the amount.

   RESPONSE: Dr. David Stockman determined Dr. Jayakumar's RVUs and compensation payments and coordinated his patient load with Felina Torres, the dermatology office manager. Felina worked closely with Dr. Jayakumar regarding patient visits. I processed his first paycheck through payroll as an administrative task, but I did not calculate his RVUs or independently determine the $10,500 amount. I do not have the underlying RVU records or calculation used by Dr. Stockman.

6. Describe, with specificity, your role in administering Dr. Jayakumar's health insurance benefits, including all actions you took, communications you had with Blue Cross Blue Shield of Michigan and/or Blue Care Network, and your knowledge of the cancellation of Dr. Jayakumar's coverage.

   RESPONSE: I handled administrative benefits and payroll matters, including relaying concerns and information about insurance coverage. Dr. Stockman handled the ongoing issues involving premium funding and payment. When coverage or premium problems were brought to my attention, I informed him and understood from his assurances that he would address them. As far as I recall, deductions were

stopped when the coverage issues became known. I did not knowingly continue deductions for coverage I knew to be inactive. I cannot identify the exact dates or all communications with BCBSM/BCN without the records.

7. Describe, with specificity, action(s) you took in response to Dr. Jayakumar's inquiries or complaints regarding missing or delayed compensation.

   RESPONSE: I vaguely recall Dr. Jayakumar raising a compensation concern, but I do not remember the precise details or resolution. My role was to relay such concerns to Dr. Stockman. Felina Torres worked closely with Dr. Jayakumar and may also have information about his complaints. I recall being involved with his first payment, but I was no longer employed at MHC for later issues arising after my departure.

8. Explain why health insurance premiums were deducted from Dr. Jayakumar's compensation after his coverage was cancelled and identify the person(s) responsible for those deductions.

   RESPONSE: I do not know why any deductions may have continued after Dr. Jayakumar's coverage was canceled, and I cannot verify from my records whether or when that occurred. As far as I was aware, deductions stopped when coverage problems were discovered; no one instructed me to knowingly deduct premiums for inactive coverage. I administered benefits and payroll information, but Dr. Stockman was responsible for addressing ongoing premium-payment issues. He would need to explain the funding and coverage decisions. I do not have the insurance or payroll records needed to identify all persons responsible for any particular deduction.

9. Identify all persons with knowledge of any of the facts or circumstances alleged in the Complaint or asserted in your Answer and describe the nature of each person's knowledge.

   RESPONSE: To my knowledge, persons who may have relevant information include Dr. David Stockman (financial decisions, physician compensation, insurance premium payments, and overall operations), Felina Torres (dermatology office operations, Dr. Jayakumar's visits, and some of his concerns), and Brian Hart (some employee or provider complaints). Their knowledge and the relevant dates should be confirmed through the records and testimony.

10. Identify all documents that support your contention that you acted solely at Stockman's direction with respect to any matter involving Dr. Jayakumar.

    RESPONSE: I have located text-message exchanges with Dr. David Stockman from January through March 2023 concerning general payroll processing, his review or approval of payroll, instructions about distributing checks, wire-payment coordination, and vendor payments. These messages predate Dr. Jayakumar's recruitment and do not mention him, but they may illustrate how Dr. Stockman directed payment decisions. I am providing the screenshots to my attorney for review of their relevance and responsiveness. I do not presently have communications specifically about Dr. Jayakumar or an organizational chart in my possession.

11. Identify each person or other entity to whom you submitted or provided a résumé, CV, application, biography, job description, or other written statement describing your duties, responsibilities, authority, or accomplishments at MHC. This includes but is not limited to current or prospective employers, recruiters, online job platforms or boards, educational institutions, scholarship or award organizations, professional organizations, and governmental bodies.

    RESPONSE: I used a résumé describing my MHC work when applying for jobs through online job application platforms and to prospective employers. I will provide the résumé I have. For doctoral applications, I used recommendation letters, including a letter from Jennifer E. Penning dated April 6, 2025, and a letter from Dr. Bassam Afaneh dated February 9, 2025, addressed to Wayne State University. I did not personally submit other company-related documents to educational institutions. I cannot recall every employer or application recipient from memory.

12. Identify each person who provided a letter of recommendation or other recommendation relating to your application to the Saginaw Valley State University MBA program, and state each person's relationship to you and the approximate date the recommendation was provided.

    RESPONSE: For my Saginaw Valley State University MBA application, I recall Ziad Daoud, Ph.D. (letter dated March 16, 2023) and Dr. Roshar Mahabir (letter dated March 17, 2023). I searched for additional MBA recommendation letters but did not locate any. Separately, I located a February 9, 2025 recommendation from Dr. Bassam Afaneh for a Wayne State University doctoral application and an April 6, 2025 recommendation from Jennifer E. Penning for a doctoral application. Those were not MBA recommendation letters.

**REQUESTS FOR PRODUCTION OF DOCUMENTS**

1. All Documents and Communications between you and Dr. Jayakumar during the Relevant Period, including but not limited to emails, text messages, letters, voicemails, and any notes or memoranda of telephone conversations.

   RESPONSE: After searching the text messages currently available to me, I did not locate messages with Dr. Jayakumar. I do not presently possess responsive emails, letters, or other communications that I can identify. Any MHC business records may be held by MHC or Dr. Stockman. I will supplement if I locate responsive materials.

2. All Documents and Communications between you and David Stockman relating to or mentioning Dr. Jayakumar during the Relevant Period.

   RESPONSE: I searched my available text messages and did not locate any messages with Dr. Stockman that mention Dr. Jayakumar. I did locate older messages with Dr. Stockman about general payroll and payment administration; I am providing those separately to my attorney to assess whether any are responsive. Other MHC business records may be held by MHC or Dr. Stockman.

3. All Documents and Communications between you and Brian Hart relating to or mentioning Dr. Jayakumar during the Relevant Period.

   RESPONSE: I have not located communications with Brian Hart specifically relating to Dr. Jayakumar in the materials currently available to me. Any additional MHC records may be in MHC's or Dr. Stockman's possession. I will supplement if responsive materials are found.

4. All Documents relating to the recruitment and hiring of Dr. Jayakumar, including but not limited to job postings, advertisements, interview notes, correspondence, and any internal communications regarding his candidacy.

   RESPONSE: I do not presently possess recruitment or hiring records for Dr. Jayakumar. To the extent such records exist, they may be held by MHC or Dr. Stockman. I will supplement if responsive materials are found.

5. All Documents relating to the negotiation of the terms of Dr. Jayakumar's Employment Agreement.

RESPONSE: I do not presently possess documents concerning negotiation of Dr. Jayakumar’s employment agreement. Such records may be held by MHC or Dr. Stockman. I will supplement if responsive materials are found.

6. All Documents relating to Dr. Jayakumar's compensation, including but not limited to payroll records, pay stubs, RVU calculations, RVU data, billing reports, and any analyses or summaries of amounts owed.

RESPONSE: I do not presently possess Dr. Jayakumar’s payroll records, pay stubs, RVU calculations, billing reports, or analyses of amounts owed. Such records may be held by MHC, Dr. Stockman, or Dr. Jayakumar. I will supplement if responsive materials are found.

7. All Documents relating to your duties, responsibilities, authority, or accomplishments at MHC, including but not limited to résumés, CVs, employment applications, applications to educational institutions, job descriptions, professional profiles, LinkedIn content, biographies, letters of recommendation, organizational charts, policies, proposals, handbooks, training materials, reports, presentations, and corporate records. This Request includes but is not limited to documents submitted to current or prospective employers, recruiters, online job platforms or boards, educational institutions, scholarship or award organizations, professional organizations, and governmental bodies.

RESPONSE: I can provide my available résumé and the recommendation letters I located: Dr. Bassam Afaneh’s February 9, 2025 letter for a Wayne State University doctoral application and Jennifer E. Penning’s April 6, 2025 doctoral recommendation. I have not located additional MBA recommendation letters or retained MHC organizational charts, personnel files, handbooks, or internal company records in my possession. I will provide these materials to my attorney for review.

8. All Documents and Communications with MHC employees or contractors in which you provided directives, policies, approvals, evaluations, warnings, discipline, or other guidance concerning their work or MHC's operations.

RESPONSE: I do not presently possess MHC employee personnel files, formal directives, evaluations, disciplinary records, or internal policies. I have located older text-message exchanges with Dr. Stockman about payroll and administrative operations and will provide them to counsel to determine whether they fall within this request. I will supplement if other responsive communications or records are located.

Dated: November 8, 2026

/s/ Magdalena Perez
Magdalena Perez, Debtor/Defendant/Third-Party Plaintiff
4355 Augustine St
Saginaw, MI 48638-6509

United States Bankruptcy Court

Eastern District of Michigan – Northern Division

| | | | |
|---|---|---|---|
| In re | MAGDALENA PEREZ,<br>Debtor | )<br>) | Case No. 24-21078-dob |
| | KISHORE JAYAKUMAR,<br>Plaintiff | ) | Adversary Proceeding: |
| | v | ) | 26-02010-DOB |
| | MAGDALENA PEREZ.<br>Defendant/Third-Party Plaintiff | )<br>) | Chapter<br>7 |
| | V | ) | |
| | DAVID STOCKMAN, AND | ) | |
| | MICHIGAN HEALTH CLINIC | ) | |
| | Third-Party Defendants | ) | |
| | ________________________________ | ) | |


MATTHEW L. FREY (P68239)
Attorney for Debtor/Defendant
4901 Towne Centre Road, Suite 235
Saginaw, MI 48604
989-799-2227
mfrey@matthewfreylaw.com

WARNER NORCROSS + JUDD LLP
Jonathan Lauderbach (P51313)
Attorney for Creditor/Plaintiff
715 East Main Street suite 110
Midland MI 48640
989-698-3700
jlauderbach@wnj.com


________________________________)

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, a copy of Defendant/Third Party Plaintiff's response to PLAINTIFF'S FIRST REQUESTS FOR ADMISSION, INTERROGATORIES, AND REQUESTS FOR PRODUCTION OF DOCUMENTS were served upon Plaintiff by and through their attorney(s) of record by ecf.

Respectfully submitted,

By: /s/ Matthew L. Frey
MATTHEW L. FREY (P68239)
4901 Towne Centre Road, Suite 235
Saginaw, MI 48604
(989) 799-2227
mfrey@matthewfreylaw.com

Dated: November 8, 2026